```
           _____ FILED _____ LODGED
           _____ RECEIVED _____ COPY

                   OCT  1 2002

           CLERK U.S. DISTRICT COURT
                DISTRICT OF ARIZONA
           BY _____ DEPUTY
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TUCSON WOMAN'S CLINIC; DAMON RAPHAEL, M.D.; OLD PUEBLO FAMILY PLANNING; WILLIAM RICHARDSON, M.D.; SIMAT CORP., d/b/a/ ABORTION SERVICES OF PHOENIX; ROBERT H. TAMIS M.D., PC; and ROBERT H. TAMIS, M.D.; on behalf of themselves and their patients seeking abortions,<br><br>             Plaintiffs,<br><br>vs.<br><br>CATHERINE EDEN in her capacity as Director of the Arizona Department of Health Services; JANET NAPOLITANO, in her capacity as Attorney General of the State of Arizona; RICHARD M. ROMLEY, in his official capacity as County Attorney for the County of Maricopa, and as representative for all other prosecuting attorneys similarly situated throughout the State of Arizona, including without limitation all County, City and Town Attorneys,<br><br>             Defendants. | No. CV 00-141-TUC-RCC<br><br>**ORDER** |

This action is a constitutional facial challenge to (a) Arizona Revised Statutes §§ 36-402, 36-449, 36-449.01, 36-449.02, 36-449.03, 36-2301.02, as revised by Arizona House Bill 2706 and Arizona House Bill 2647; and (b) Arizona Regulation Title 9, Chapter 10, Article

15, as amended (collectively referred to as the "Regulatory Scheme"). The challenged statutes and regulations provide for the licensing, supervision, regulation and control of physician practices in which five or more first trimester abortions per month or any post-first trimester abortions are performed. Plaintiffs' Complaint[1] requests (1) a declaratory judgment, finding the challenged statutes and regulations unconstitutional, and (2) a permanent injunction against their enforcement. Plaintiffs are healthcare providers whose practice includes the performing of five or more first trimester abortions per month who bring this action on their own behalf and on behalf of their patients seeking abortions. *See Singleton v. Wulff*, 428 U.S. 106, 118 (1976) (allowing physicians to assert the constitutional rights of their patients). Defendants include Catherine Eden, Director of the Arizona Department of Health Services, Janet Napolitano, Attorney General of the State of Arizona, and a class of all prosecuting attorneys in the state of Arizona, represented by Richard Romley, County Attorney for the County of Maricopa.

Plaintiffs allege that the Regulatory Scheme is constitutionally defective for the following reasons:

1.      It violates the rights of Plaintiffs and their patients to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution by impairing women's ability to exercise their fundamental right to choose abortion; (Compl. ¶ 74.)

2.      The provisions allowing for warrantless searches of physicians' offices and patient records violate Plaintiffs' and their patients' right to be free from unreasonable searches and seizures guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution; (Compl. ¶76.)

3.      The Regulatory Scheme's failure to ensure the confidentiality of the physician-patient relationship or of patients' medical records violates Plaintiffs' patients' right to

---

[1] "Complaint" refers to Plaintiffs' Fourth Amended Complaint filed on January 23, 2001.

- 2 -

information privacy as guaranteed by the Fourteenth Amendment to the United States Constitution; (Compl. ¶ 78.)

4.    The purpose of the Regulatory Scheme is not reasonably related to a legitimate state interest and therefore, creates an undue burden on a woman's ability to have an abortion and violates Plaintiffs' patients' right to privacy under the Fourteenth Amendment to the United States Constitution; (Compl. ¶ 80.)

5.    Vague and uncertain terms in the Regulatory Scheme fail to give adequate notice of conduct that will subject Plaintiffs to criminal, administrative and civil penalties and expose Plaintiffs to arbitrary enforcement of the Regulatory Scheme; and (Compl. ¶82.)

6.    The provision delegating the licensing authority to hospitals that control physicians' admitting privileges violates Plaintiffs' due process rights under the Fourteenth Amendment to the United States Constitution. (Compl. ¶ 84.)

The parties have filed cross-motions for summary judgment. Defendants filed six separate motions for partial summary judgment, one for each of Plaintiffs' claims. Plaintiffs' motion for summary judgment seeks relief in their favor, as a matter of law, on all claims except for their undue burden claim. Plaintiffs contend that there is a disputed issue of material fact as to the undue burden claim and therefore, summary judgment would be inappropriate. The parties have also filed evidentiary motions seeking to preclude portions of their opponent's statement of facts. The Court will rule on these evidentiary motions to the extent that the challenged material is necessary for the Court's disposition.

SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that a court may grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party seeking summary judgment must identify those parts of the record that indicate the absence of a

1    genuine issue of material fact. *Celotex Corp. v. Caltrett*, 477 U.S. 317 (1986); *Anderson v.*

2    *Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio*

3    *Corp.*, 475 U.S. 574 (1986). Once the moving party has made this showing, the nonmoving

4    party must designate which specific facts show that there is an issue for trial. *Celotex*, 477

5    U.S. at 324, *citing* Fed.R.Civ.P. 56(e). The moving party is held to a strict standard, and any

6    doubts about the existence of a genuine issue of material fact will be resolved against it.

7    *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

8          Under Fed.R.Civ.P. 56(e), in response to a properly supported motion for summary

9    judgment, the opposing party "must set forth specific facts showing that there is a genuine

10   issue for trial." The inquiry performed by the trial court is to determine whether there are

11   "any genuine factual issues that properly can be resolved only by a finder of fact because they

12   may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. For an issue

13   to be "genuine," there must be evidence such that a "reasonable jury" could reach a verdict

14   in favor of the nonmoving party. *Id.* at 248.

15   FACIAL CHALLENGE STANDARD[2]

16          "A facial challenge to a legislative Act is, of course, the most difficult challenge to

17   mount successfully, since the challenge must establish that no set of circumstances exists

18   under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

19   If an act "can be construed in such a manner that [it] can be applied to a set of individuals

20   without infringing upon constitutionally protected rights," a facial challenge must fail. *See*

21   *Rust v. Sullivan*, 500 U.S. 173, 183 (1991). Anticipation of the effects of an act, is generally

22   not an appropriate basis on which to strike down statutes and regulations. *See Bowen v.*

23   *Kendrick*, 487 U.S. 589, 612-13 (1988) (noting that "[i]t has not been the Court's practice"

24   _____

25   [2] The following is the general standard used when reviewing a constitutional facial challenge to a
     statute. The Ninth Circuit in *Planned Parenthood of Southern Arizona v. Lawall*, 180 F.3d 1022 (9th
26   Cir. 1999), held that facial challenges to abortion statutes should be reviewed under the "undue
     burden" standard set forth by the Supreme Court in *Casey*. While this Court will apply the *Casey*
27   standard to Plaintiffs' undue burden claim, it finds that the general standard is appropriate for
28   Plaintiffs' other claims.

1    to strike down a statute on a facial challenge "in anticipation" of particular circumstances,

2    even if the circumstances would amount to a "likelihood"); *see also Greenville Women's*

3    *Clinic v. Bryant*, 222 F.3d 157, 164 (4th Cir. 2000).

4    EQUAL PROTECTION CLAIM

5         Plaintiffs contend that the Regulatory Scheme creates three impermissible

6    classifications which violate the Equal Protection Clause of the Fourteenth Amendment: (1)

7    physician practices that provide abortions are singled out from physician practices that

8    provide comparable procedures, (2) women seeking abortions versus men seeking similar

9    medical procedures and (3) physician practices that provide five or more first trimester

10   abortions per month and those that provide one to four. The Equal Protection Clause of the

11   United States Constitution "commands that no state shall 'deny to any person within its

12   jurisdiction the equal protection of the laws,' which is essentially a direction that all persons

13   similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S.

14   432, 439 (1985) (*quoting Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The Supreme Court has

15   developed three different levels of review for determining whether governmental

16   classifications comply with the Constitution's mandate of fair and equal governmental

17   treatment. *Cleburne*, 473 U.S. at 440-41. The most stringent standard of judicial equal

18   protection review, "strict scrutiny," is triggered only when a regulation targets a suspect class

19   or impinges upon a fundamental right protected by the constitution. *See Greenville Women's*

20   *Clinic*, 222 F.3d at 172.

21       *a) Physician practices that provide abortions and physician practices that provide*
22                    *comparable procedures*

23       Plaintiffs argue that "strict scrutiny" is appropriate when reviewing the classification

24   of physicians based on whether they perform abortions. Physicians are not considered

25   members of a suspect class for purposes of equal protection analysis therefore, "strict

26   scrutiny" is only appropriate if the Regulatory Scheme impinges on a fundamental right.

27   Defendants contend that the Supreme Court's decision in *Planned Parenthood of*

28   *Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), called into serious doubt the

1   Supreme Court's previous holding in *Roe v. Wade*, 410 U.S. 113 (1973), that the right to an

2   abortion was a fundamental right.   After *Casey*, it is unclear whether abortion is a

3   fundamental right because regulatory schemes pertaining to abortion need not serve a

4   compelling state interest. *See Casey*, 505 U.S. at 874 (O'Connor, Kennedy and Souter, JJ.,

5   joint opinion).

6         In this case, the classification of physicians does not directly implicate a fundamental

7   right; even if abortion remains a fundamental right after *Casey*, the fundamental right is that

8   of a woman to choose an abortion, not of a doctor to perform one.  If the challenged

9   classification does not impinge on a fundamental right, the court should review it using the

10  rational basis test. Legislative classifications subject to a rational basis standard of review

11  are presumed to be constitutional, a presumption "that can be overcome by a clear showing

12  of arbitrariness and irrationality." *Hodel v. Indiana*, 452 U.S. 314, 331-32 (1981). Here, the

13  state of Arizona had a rational basis for the Regulatory Scheme, protecting maternal health

14  and welfare. *See Casey*, 505 U.S. at 847 ("the state has legitimate interests from the outset

15  of the pregnancy in protecting the health of the woman"). Moreover, abortion is inherently

16  different from other medical procedures. *See id*. at 852; *Greenville Women's Clinic*, 222 F.3d

17  at 173. Finally, the state of Arizona was reacting to specific incidents, including the death of

18  Lou Anne Herron from complications associated with an abortion, where maternal health was

19  impacted by sub-standard medical care. (Equal Protection DSOF at ¶2.) The Regulatory

20  Scheme's classification of physician practices based on whether they perform abortions does

21  not violate the Equal Protection clause of the United States Constitution because the state of

22  Arizona had a rational basis for creating the classification.

23         *b) Regulatory Scheme Impermissibly Discriminates on the Basis of Sex*

24         Plaintiffs argue that Arizona has created a regulatory scheme which burdens only

25  women seeking medical care. The Supreme Court has held that a classification based on sex

26  must show "at least that the classification serves important governmental objectives and that

27  the discriminatory means employed are substantially related to the achievement of those

28

objectives." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). Defendants oppose Plaintiffs' position by clarifying that classification concerning pregnancy is not necessarily sex-based classification. *See Gedulig v. Aiello*, 417 U.S. 484, 496 n. 20 (1974). Supreme Court jurisprudence concerning the right to have an abortion is clearly rooted in substantive due process, not equal protection. Therefore, the Court concludes that the Regulatory Scheme does not violate the Equal Protection Clause by impermissibly discriminating on the basis of sex.

> *c) Physician practices that provide five or more first trimester abortions per month compared to practices that provide one to four first trimester abortions.*

Plaintiffs' final equal protection argument is that the Regulatory Scheme impermissibly classifies physician practices based on how many first trimester abortions they provide. According to Plaintiffs, the classification based on whether the physician practice provides five or more first trimester abortions per month is not rationally related to the State's interest in maternal health because more experienced abortion providers perform safer abortion procedures. While Plaintiffs' position may be true, courts may not second-guess a legislature's "line drawing" when it would be permissible for the legislature to regulate all abortion providers irrespective of how many abortions they provide. *See Greenville*, 222 F.3d at 174; *Women's Medical Center of Northwest Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001). Therefore, the Regulatory Scheme's classification of abortion providers based on how many first trimester abortions they provide does not violate equal protection.

After reviewing the parties' arguments and supporting materials, the Court will deny Plaintiffs' motion for summary judgment and will grant Defendants' motion for summary judgment on Plaintiffs' Equal Protection claim.

FOURTH AMENDMENT

The parties' motions for summary judgment addressing Plaintiffs' Fourth Amendment claim focus on whether physicians' offices should be considered closely regulated businesses. With regard to commercial property employed in a "closely regulated business," the expectation of privacy is "particularly attenuated" and, therefore, no warrant is required.

1    *New York v. Burger*, 482 U.S. 691, 699 (1987); *Marshall v. Barlow's, Inc.*, 436 U.S. 307

2    (1978). The Court finds that Plaintiffs' Fourth Amendment claim raises two distinct issues.

3    First, Plaintiff's claim calls into question whether the portion of the Regulatory Scheme

4    requiring licensed physicians to ensure the Department of Health Services ("DHS") access

5    to the abortion clinic violates physicians' Fourth Amendment rights.[3] The second issue raised

6    is whether the regulation requiring physicians to disclose patient medical records without a

7    warrant violates patients' Fourth Amendment rights.[4] After reviewing the parties' arguments,

8    the Court concludes that the entry of DHS employees into physicians' offices should be

9    reviewed by determining whether the "closely regulated business" exception to the warrant

10   requirement applies to physicians' offices. However, the disclosure of patient medical

11   records is more properly addressed as an informational privacy claim.

12          In determining whether the Department of Health Services may access licensed

13   abortion clinics without a warrant, the Court must determine whether physicians' offices are

14   closely regulated businesses. In determining whether a business is "closely regulated" courts

15   should look at three factors: (1) the duration of a particular regulatory scheme, (2) the

16   pervasiveness of the regulation and (3) the regularity of the regulation. Due to the sensitive

17   nature of abortion and the physician-patient relationship, licensed abortion clinics are

18   sufficiently different from the other places of business that courts have found to be closely

19   regulated. *See New York v. Burger*, 482 U.S. 691, 710-12 (1987) (auto junkyard); *United*

20

21   _____

22          [3]  "A licensee shall ensure that the Department's director or director's designee is
     allowed immediate access to the abortion clinic during the hours of operation." Ariz. Admin.
23   Code R9-10-1503 (B)(4).

24          [4]  "A licensee shall ensure that a medical record maintained at the abortion clinic is
     provided to the Department for review no later than 2 hours from the time the Department
25   requests the medical record." Ariz. Admin. Code R9-10-1511 (A)(4)(b).

26          "A licensee shall ensure that a medical record maintained off-site is provided to the
     Department for review no later than 24 hours from the time the Department requests the
27   medical record." Ariz. Admin. Code R9-10-1511 (A)(4)(c).

28

1    *States v. Biswell*, 406 U.S. 311 (1972) (firearms); *Colonnade Catering Corp. v. United*

2    *States*, 397 U.S. 72 (1970) (catering business); *United States v. Argent Chem. Labs.*, 93 F.3d

3    572 (9th Cir. 1996) (veterinary drug industry). Therefore, Arizona Administrative Code

4    regulation R9-10-1503(B)(4), on its face, violates the warrant requirement of the Fourth

5    Amendment because it permits warrantless searches without sufficient justification.

6    <u>INFORMATIONAL PRIVACY</u>

7        Plaintiffs contend that the Regulatory Scheme violates patients' right to informational

8    privacy in three ways; (1) the Regulatory Scheme allows DHS to review unredacted patient

9    medical records, remove such records from the provider's facilities, and retain copies of

10   those records in DHS's offices; (2) the Regulatory Scheme requires providers to submit to

11   a contractor of DHS copies of fetal ultrasound prints when the patient is obtaining an

12   abortion after twelve weeks gestation and (3) the Regulatory Scheme forces Plaintiffs to

13   consent to unannounced and warrantless searches of their medical offices by DHS at any time

14   and for any reason.

15       Courts have consistently recognized that individuals have a constitutionally protected

16   privacy interest "in avoiding disclosure of personal matters," including medical information.

17   *See generally Doe v. Attorney Gen.*, 941 F.2d 780, 795 (9th Cir. 1991). Individuals' privacy

18   interest in personal information is not absolute and may yield to the government's interest

19   in obtaining certain information. The Court balances following factors to determine whether

20   the government's interest outweighs the individual's:

    (1) the type of information requested;
21   (2) the potential for harm in any subsequent non-consensual disclosure;
    (3) the adequacy of safeguards to prevent unauthorized disclosure;
22   (4) the degree of need for access; and
    (5) whether there is an express statutory mandate, articulated public policy, or
23   other recognizable public interest militating toward access.
    *In re Crawford*, 194 F.3d 954, 959 (1999).
24

25       *A) Unredacted Patient Medical Records*

26       While Defendants characterize the type of information requested as limited, the Court

27   disagrees and finds that the information contained in patient medical records is extensive and

28

intensely personal. The regulations require that the patient medical records contain information including the patient's medical, obstetrical and gynecological history, medications the patient is currently taking and other medical conditions. *See* Ariz. Admin. Code R9-10-1511; Ariz. Admin. Code R9-10-1508 (A)(1). The relevant medical records would also contain patient identification information including the patient's name, address and date of birth, in addition to ultrasound results and the estimated gestational age of the fetus. *Id*. As a result of the type of information contained in the medical records, the potential for harm if the information was disclosed is enormous. While the Department of Health Services is governed by several statutes and regulations designed to safeguard confidential information and prevent unauthorized disclosures, this factor is outweighed by DHS's limited need to know the identity of the patient. If DHS's goal is to ensure that doctors are performing safe abortions and meeting the licensing requirements, redacted medical reports without references to patient identification information are sufficient to meet that goal. The Court is not persuaded by Defendants' argument that their investigations will be substantially delayed, if patient-identifying information is redacted from the medical record. In this case, the public's interest in ensuring that abortions are safe does not vitiate the patient's right to informational privacy of intensely personal medical documents. Therefore, the Court concludes that Arizona Administrative Code regulations R9-10-1511(A)(4)(b) and R9-10-1511(A)(4)(c) are, on their face, unconstitutional because they violate an individual's right to informational privacy.

### B) Ultrasound Prints

After twelve weeks gestation, the Regulatory Scheme requires licensed abortion providers to generate a fetal ultrasound print and provide it to DHS and an independent contractor for review. While the disclosure of the ultrasound prints to DHS raises many of the same privacy concerns as the disclosure of medical records, their disclosure to DHS with patient identifying information raises an additional consideration. The Regulatory Scheme provides that "[t]he department of health services shall contract with qualified public or

private persons or corporations for review of ultrasound results to determine compliance with this section." A.R.S. §36-2301.02(C). The contractor must review ultrasound results to verify the accuracy of the fetus' estimated gestational age and file a monthly report noting, among other things, any significant inaccuracy in the estimated gestational age of the fetus. The Department of Health Services will forward this report to the appropriate professional regulatory boards for their review. *See* A.R.S. §36-2301.02. Defendants indicate that DHS will use a coding system which will prevent the contractor who reviews the ultrasound prints from learning the patient's identity. (Defs.' Info. Privacy Mot. for Summ J. at 7; DSOF ¶8.) This coding system is not part of the Regulatory Scheme and there is no assurance that the proposed system would be employed. Therefore, Arizona Revised Statute section 36-2301.02(C) violates a patient's right to information privacy by disclosing personal information contained on the ultrasound print to 1) the Department of Health Service and 2) an independent contractor.

The portion of the Regulatory Scheme providing for warrantless searches of physicians' offices is addressed in the section of this order discussing Plaintiffs' Fourth Amendment claim. Accordingly, the Court will grant, in part, and deny, in part, Plaintiffs' and Defendants' motions for summary judgment on Plaintiffs' informational privacy claim.

UNLAWFUL DELEGATION

Plaintiffs' unlawful delegation claim arises from the Regulatory Scheme's section requiring that "[a] physician with admitting privileges at an accredited hospital in this state is in the physical facilities until each patient is stable and ready to leave the recovery room." Ariz. Admin. Code R9-10-1506(B)(2). Plaintiffs contend that this provision "grants local hospitals unbridled power to determine whether Plaintiffs may continue to provide abortions." (Pls.' Mot. for Summ. J. at 25.) According to Plaintiffs, granting third parties authority to prevent otherwise legal abortions is unconstitutional. *Id.* Defendants respond by stating that "a facial challenge to a grant of authority—in the absence of any actual deprivation of rights—only has merit if the delegation explicitly allows the violation of

constitutional rights." (Defs.' Reply at 1.) Because no doctors have yet been denied admitting privileges, their argument continues, Plaintiffs must show that the regulatory scheme's delegation of authority is on its face unconstitutional. Defendants contend that the Regulatory Scheme does not explicitly grant hospitals the discretion to act in an unconstitutional manner, therefore, Plaintiffs' challenge has no merit.

Plaintiffs attempt to analogize the admitting privileges requirement in the Regulatory Scheme to the judicial bypass provision required in parental consent statutes. Courts have consistently held that statutes which give judges discretion to deny minors abortions when the minor is informed and mature enough to make a sound decision or the abortion would be in the minor's best interest are unconstitutional. *See Bellotti v. Baird*, 443 U.S. 622, 647 (1979); *Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096 (5th Cir. 1997), *overruled on other grounds*, *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001). However, in this case, the Regulatory Scheme and Arizona state law do not vest hospitals with discretion in deciding which doctors should be granted admitting privileges. Both private and public hospitals must comport with both procedural and substantive due process in reviewing an application for admitting privileges. *See Holmes v. Hoemako Hosp.*, 573 P.2d 477 (Ariz. 1977) (private hospitals); *Peterson v. Tucson Gen. Hosp.*, 559 P.2d 186 (Ariz. App. 1976) (public hospitals). The delegation of authority, here, is not inherently unconstitutional because it does not explicitly give hospitals the authority to act in an unconstitutional manner. Moreover, the authority it does grant is not unbridled or unfettered because it is subject to judicial review and will be held up to constitutional standards. Therefore, the Court will deny Plaintiffs' motion for summary judgment and grant Defendants' motion for summary judgment on Plaintiffs' unlawful delegation claim.

VAGUENESS

Plaintiffs assert that the Regulatory Scheme violates the Due Process Clauses of the Fifth and Fourteenth Amendments because some of the scheme's provisions are unconstitutionally vague. In response, Defendants contend that the scheme is not

1  unconstitutional vague and that the majority of Plaintiffs' objections are premature because

2  the objections are "as-applied" challenges and there has been no evidence of any improper

3  enforcement. (Defs.' Resp. to Pls.' Mot. for Summ. J. at 16.)

4       The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that

5  persons "of common intelligence must necessarily guess at [their] meaning and differ as to

6  [their] application." *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974) (citation omitted). A law

7  is unconstitutionally vague if it fails to provide those targeted by the statute a reasonable

8  opportunity to know what conduct is prohibited, or is so indefinite that it allows arbitrary and

9  discriminatory enforcement. *See Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

10      If the statute subjects transgressors to criminal penalties, then a vagueness review is

11 even more exacting. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983).   However,

12 "[s]tatutes need not be written with 'mathematical' precision, nor can they be thus written."

13 *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000) (citation omitted). Rather, a

14 statute "must be intelligible, defining a 'core' of proscribed conduct that allows people to

15 understand whether their actions will result in adverse consequences." *Id.* (citation omitted).

16 "In addition to defining a core of proscribed behavior to give people constructive notice of

17 the law, a criminal statute must provide standards to prevent arbitrary enforcement." *Id.*

18 (citing *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999)).

19      Plaintiffs   claim   that   numerous   terms   used   in   the   Regulatory   Scheme   are

20 unconstitutionally vague. For purposes of this decision, the Court has grouped some terms

21 due to their similarity. Plaintiffs argue that the definition of "gestational age"[5] contains two

22 incompatible methods of calculation because they produce estimates roughly two weeks

23 apart. The definition of "gestational age" is not unconstitutionally vague because it provides

24 physicians with two methods by which they can comply with the Regulatory Scheme. Several

25 of the challenged terms involve medical terms of art or medical judgments: "potentially life-

26

27  _____

28  [5] "'Gestational age' means the number of completed weeks of the unborn fetus as calculated from the
first day of the last menstrual period or the date of fertilization." Ariz. Admin Code R 9-10-1501(17).

threatening,"[6] "serious injury,"[7] "vital signs,"[8] and drugs and equipment needed to support and monitor cardiopulmonary function.[9] In *Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999), the Seventh Circuit stated that the central principle established in *Colautti v. Franklin*, 439 U.S. 379 (1975), is that "an abortion statute that imposes liability on a physician for erroneous medical determinations is void for vagueness only if it leaves physicians uncertain as to the relevant legal standard under which their medical determinations will be judged." *Karlin*, 188 F.3d at 463. The *Karlin* court observed that "physicians have a duty to exercise due care, i.e. act reasonably, in treating all their patients and this duty extends to a physician's decision to perform an emergency abortion." *Id*. The Seventh Circuit stated:

> [w]hile it is certainly true that physicians may disagree as to whether a specific situation rises to the level of posing a significant treat to a woman's health sufficient to necessitate an immediate abortion, the fact that one physician would choose to perform the emergency abortion under those circumstances while others would not, does not necessarily mean the former physician is acting unreasonably. In any given medical situation there is likely to be a number of reasonable medical options and disagreement between doctors over the appropriate course of action does not, of course, render one option reasonable and another unreasonable.
> *Id*.

This Court agrees with the Seventh Circuit's reasoning in concluding that "serious injury" and "potentially life threatening" are not unconstitutionally vague. In addition, "vital signs"

---

[6] "'Emergency' means a potentially life-threatening occurrence that requires an immediate response or medical treatment." Ariz. Admin. Code R9-10-1501(13).

[7] "'Serious injury' means an injury that occurs at an abortion clinic and that creates a serious risk of substantial impairment of a major body organ." Ariz. Admin. Code R9-10-1501(41).

[8] "G. A medical director shall ensure that:
  1. Patient care staff monitor the patient's vital signs throughout the abortion procedure to ensure the patient's health and safety."
  Ariz. Admin. Code R9-10-1508(G)(1).

[9] "5. In addition to the requirements in subsection (4), the following equipment is available [in the licensed abortion clinic] for an abortion procedure performed after the first trimester:...
  b. Drugs to support cardiopulmonary function; and
  c. Equipment to monitor cardiopulmonary status;..."
  Ariz. Admin. Code R9-10-1513(5)(b)&(c).

- 14 -

and drugs and equipment needed to support and monitor cardiopulmonary function are sufficiently understood within the medical community and are therefore, not unconstitutionally vague.

Two provisions of the Regulatory Scheme require physicians and the ultrasound independent contractor to review fetal ultrasound prints. Physicians are required to "interpret" the original ultrasound print despite the fact that the ultrasound machine performs the necessary calculations to determine the fetus's gestational age.[10] In addition, the contractor chosen to provide ultrasound review services shall report significant inaccuracies in the estimated gestational age of the fetus.[11] While these two provisions rely on the professional judgment of medical personnel, the Court concludes that they are not unconstitutionally vague. Plaintiffs further contend that the Regulatory Scheme's provision governing the staffing,[12] maintenance[13] and layout[14] of licensed abortion clinic are

---

[10] "D. If a physical examination or other information obtained from the patient or laboratory tests indicate the gestational age of the fetus is greater than 12 weeks, a medical director shall ensure that:
. . .
    3. An original ultrasound print is:
        a.  Interpreted by a physician; and
        b.  Maintained in the patient's medical record."
Ariz. Admin. Code R9-10-1508(D)(3).

[11] "E. Beginning on January 1, 2001, on a monthly basis, persons or corporations providing ultrasound review service to the department pursuant to this section shall file a report with the director regarding ultrasound results noting:
    1.  Any instances in which the contractor believes there was a significant inaccuracy in the estimated gestational age of the fetus made before the abortion."
A.R.S. § 36-23001.01(E).

[12] "A. A licensee shall ensure that there are a sufficient number of patient care staff and employees to:
    1. Meet the requirements of this Article;
    2. Ensure the health and safety of a patient; and
    3. Meet the needs of a patient based on the patient's medical evaluation."
    Ariz. Admin. Code R9-10-1506(A).

"B. A licensee shall ensure that: . . .
    3. If a physician is not present, a nurse or nurse practitioner or a physician assistant:

1  standardless and vague. The portions of the Regulatory Scheme governing the staffing,

2  maintenance and layout of licensed abortion clinics are constitutional because they are

3  sufficiently clear and are not so indefinite as to allow arbitrary and discriminatory

4  enforcement. Plaintiffs also argue that the Regulatory Scheme's requirement that the clinic's

5  medical director ensure written polices and procedures are developed and implemented

6  governing individuals who counsel patients in the clinic is vague because it does not define

7

8

9

10
    a. Monitors each patient during the patient's recovery following the abortion;
     and

11
    b. Remains in the physical facility until each patient is discharged by a
     physician."

12
Ariz. Admin. Code R9-10-1506(B)(3).

13
[13] "A licensee shall ensure that:

14
   1. Physical facilities:

15
    a. provide lighting and ventilation to ensure the health and safety of a patient;
    b. Are maintained in a clean condition;

16
    c. Are free from a condition or situation that may cause a patient to suffer

17
     physical injury;
    d. Are maintained free from insects and vermin; and

18
    e. Are smoke-free."

19
Ariz. Admin. Code R9-10-1512(1).

20
[14] "B. A licensee shall ensure that an abortion clinic provides areas or rooms:
   1. That provide privacy for:

21
    a. A patient's interview, medical evaluation, and counseling;

22
    b. A patient to dress; and
    c. Performing an abortion procedure;

23
   1. For personnel to dress;

24
   2. With a sink in working order and a flushable toilet;
   3. For cleaning and sterilizing equipment and supplies;

25
   4. For storing  medical records;

26
   5. For storing equipment and supplies;
   6. For hand washing before the abortion procedure; and

27
   7. For a patient recovering after an abortion."
Ariz. Admin. Code R9-10-1514(B).

28

what training and experience are needed to be "qualified."[15] The Regulatory Scheme does not require any particular qualification, only that clinic directors decide for themselves what amount and type of training counselors should complete before providing counseling in their clinic. Therefore, this provision of the Regulatory Scheme is neither standardless nor vague. Additionally, Plaintiffs express concern that the maintenance of patient records at licensed clinics for at least six months is burdensome if physicians retire or otherwise close their practices.[16] This provision is not vague and any challenge to the burden that it places on physicians is properly raised in another claim for relief.

The final provision of the Regulatory Scheme that Plaintiffs challenge on the basis of vagueness involves a patient's rights while being treated at a licensed abortion clinic. The Regulatory Scheme requires that

> [a] licensee shall ensure that a patient is afforded the following rights, and is informed of these rights:
> 1. To be treated with consideration, respect, and full recognition of the patient's dignity and individuality.

Ariz. Admin. Code R9-10-1507(1).

The Fifth Circuit held unconstitutional an abortion regulation requiring physicians to "enhance" their patient's dignity and self-esteem and requiring physicians to provide a degree of care that met or exceeded the patient's expectations. *See Women's Med. Ctr. of Northwest Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001). In finding the regulations unconstitutional, the Fifth Circuit determined that the regulation "impermissibly subjects

---

[15] "C. A medical director shall ensure written polices and procedures are developed and implemented for:

. . .

> Individuals qualified to provide counseling in the abortion clinic and the amount and type of training required for an individual to provide counseling."
Ariz. Admin. Code R9-10-1503(C)(2).

[16] "a. A medical record is maintained at the abortion clinic for at least 6 months from the date of the patient's discharge."
Ariz. Admin. Code R9-10-1511(A)(4)(a).

- 17 -

1  physicians to sanctions based not on their own objective behavior, but on the objective

2  viewpoints of others." *Id.*

3      The Fifth Circuit further noted that "[i]t was no solace that . . . no abortion facility has

4  yet been subjected to civil or criminal penalties for violating these regulatory provisions.

5  Especially in the context of abortion, a constitutionally protected right that has been a

6  traditional target of hostility, standardless laws and regulations such as these open the door

7  to potentially arbitrary and discriminatory enforcement." *Id.* While the provision in this case

8  does not require physicians to enhance the patient's dignity, it suffers from the same

9  constitutional infirmity as the regulation in *Women's Medical Center of Northwest Houston*

10 *v. Bell.* The Court will grant Plaintiff's Motion for Summary Judgment, in part, to the extent

11 it argues that Arizona Administrative Code regulation R9-10-1507(1) is unconstitutionally

12 vague. The Court will grant, in part, Defendants' motion for summary judgment as to all

13 other terms that Plaintiffs challenge as unconstitutionally vague.

14 DUE PROCESS—UNDUE BURDEN

15     Plaintiffs allege that the Regulatory Scheme creates an undue burden on a woman's

16 right to decide to have an abortion because it 1) increases the cost of obtaining an abortion,

17 2) threatens patient confidentiality, 3) stigmatizes and marginalizes the provision of abortion,

18 4) usurps abortion providers' ability to exercise their medical judgment, and 5) grants

19 hospitals the authority to interfere with a woman's right to choose an abortion. This Court

20 has addressed the Regulatory Scheme's threat to patient confidentiality and the

21 appropriateness of hospitals' ability to decide admitting privileges in previous sections of this

22 order. The effect of the Regulatory Scheme on physicians does not directly effect a woman's

23 right to decide to have an abortion. Whether the Regulatory Scheme stigmatizes and

24 marginalizes abortion providers or usurps abortion providers' ability to exercise their medical

25 judgment are not appropriate questions for this Court. Therefore, the remaining issue is

26 whether the implementation of the Regulatory Scheme will result in increased costs for

27 abortions and create an undue burden on a woman's right to decide to have an abortion.

28

Plaintiffs contend that their evidence creates a material dispute of fact and therefore, summary judgment is inappropriate. Defendants respond by arguing that the Regulatory Scheme serves a valid purpose, was not enacted for an invidious purpose and that Plaintiffs have failed to demonstrate that the implementation of the Regulatory Scheme will result in prohibitive cost increases. Regulations "designed to foster the health of a woman seeking an abortion" are valid as long as they do not constitute an "undue burden." *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 878 (joint opinion of O'Connor, Kennedy and Souter, JJ.). Courts must find that an abortion regulation is an "undue burden" when it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. "[U]ndetermined fee increases predicted by abortion providers, but not supported by specific credible estimates, when weighed against the regulations' health benefits, do not constitute an undue burden on women seeking abortions." *Women's Med. Ctr. of Northwest Houston v. Archer*, No. H-99-3639, slip op. at 60-64 (S.D. Tex. 1999), *rev'd in part*, 248 F.3d 411 (2001). Even if this Court considers all of Plaintiffs' purported facts as true, Plaintiffs have failed to establish that any increase in the cost of abortions due to the Regulatory Scheme creates a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. Therefore, the Court will grant Defendants' Motion for Summary Judgment on Plaintiffs' Undue Burden Claim.

SEVERABILITY

The Regulatory Scheme contains a severability clause. "If a provision of this act is held invalid, the invalidity of that specific provision does not affect the validity of any other section of this act that is not specifically held to be invalid, and to this end the provisions of this act are severable." 1999 Ariz. Sess. Laws HB 2706, sec. 10. Therefore, the portions of the Regulatory Scheme ruled unconstitutional by this order can be cleanly severed from the Regulatory Scheme without additional provisions being held invalid.

**IT IS HEREBY ORDERED** that:

(1) Plaintiffs' April 30, 2001 Motion for Summary Judgment [docket #132-1] is GRANTED, in part, and DENIED, in part;

(2) Defendants' May 1, 2001 Motion for Summary Judgment on Plaintiffs' Equal Protection Claim [docket #143-1] is GRANTED;

(3) Defendants' May 1, 2001 Motion for Summary Judgment on Plaintiffs' Fourth Amendment Claim [docket #138-1] is DENIED;

(4) Arizona Administrative Code regulation R9-10-1503(B)(4) is unconstitutional because it violates the Fourth Amendment to the United States Constitution;

(5) Defendants' May 1, 2001 Motion for Summary Judgment on Plaintiffs' Informational Privacy Claim [docket #141-1] is DENIED;

(6) Arizona Revised Statute section 36-2301.02(C) and Arizona Administrative Code regulations R9-10-1511(A)(4)(b) and R9-10-1511(A)(4)(c) are unconstitutional because they violate an individual's constitutional right to informational privacy;

(7) Defendants' May 1, 2001 Motion for Summary Judgment on Plaintiffs' Unlawful Delegation Claim [docket #139-1] is GRANTED;

(8) Defendants' May 1, 2001 Motion for Summary Judgment on Plaintiffs' Vagueness Claim [docket #140-1] is GRANTED, in part, and DENIED, in part;

(9) Arizona Administrative Code regulation R9-10-1507(1) is unconstitutionally vague;

(10) Defendants' May 1, 2001 Motion for Summary Judgment on Plaintiffs' Undue Burden Claim [docket #145-1] is GRANTED;

(11) Plaintiffs' May 31, 2001 Motion to Strike Portions of Defendants' Summary Judgment Submissions [docket #154-1] is DENIED;

(12) Plaintiff's June 29, 2001 Second Motion to Strike Portions of Defendants' Summary Judgment Submissions [docket #181-1] is DENIED;

(13) Defendant's June 29, 2001 Motion to Preclude Consideration of Evidence

1    [docket #179-1] is DENIED;

2    (14)   Defendants are permanently enjoined from enforcing any portion of the

3    Regulatory Scheme ruled unconstitutional by this Order; and

4    (15)   The Clerk of the Court is directed to enter judgment and close the case.

5

6              Dated this 30th day of September, 2002.

7

8                                                          _____

9                                                          RANER C. COLLINS
                                                           United States District Judge